IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| v. | * | Criminal Action No. RDB-13-00256 |
| SHARIEEF DUPREE, | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On July 18, 2013, Defendant Sharieef Dupree ("Defendant" or "Dupree") was charged in a three-count Superseding Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count One), possessing heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count Two), and possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count Three).[1] Pending before this Court are Defendant Sharieef Dupree's Motions to (1) Suppress Evidence (ECF No. 18) with respect to the firearm that was seized, (2) Suppress Statements (ECF No. 19) made by Defendant to the arresting officer, and (3) Suppress Tangible and Derivative Evidence (ECF No. 20) with respect to narcotics that were seized pursuant to a search incident to his arrest. The Court heard testimony and argument on Dupree's motions during a two-day motions hearing held on Thursday, August 1, 2013 and Friday, August 9, 2013. For the reasons that follow, Defendant Sharieef Dupree's Motion to Suppress Evidence (ECF No. 18), specifically the firearm, is GRANTED. However, Defendant

---

[1] Following the receipt of a report identifying the drugs as heroin, the government dismissed the cocaine possession charge in Count Three figuring in the original Indictment.

1

Sharieef Dupree's Motion to Suppress Statements (ECF No. 19) and Motion to Suppress Tangible and Derivative Evidence (ECF No. 20) are DENIED.[2]

BACKGROUND

On June 5, 2012, at approximately 6:30 p.m., City Watch Camera Operator Jesus Leon ("Leon")[3] was in the City Watch Camera Center observing, via a remotely controlled camera, the activity on the 600 block of Cokesbury Avenue, Baltimore, Maryland. According to him, he was monitoring that block because a shooting had occurred in that area the previous day. At the hearing, Leon testified that, for about the next twenty minutes, he focused his observations on a man, later identified as Defendant Sharieef Dupree ("Defendant" or "Dupree"), with a yellow shirt who was "displaying characteristics of an armed person." Aug. 9, 2013, Mots. Hrg., ECF No. 45. As Leon reviewed the tape of the footage from the events relevant to this case, admitted and played during the hearing as Government Exhibit 1, he identified for the Court several of Defendant's actions which led him to believe that Defendant Dupree was carrying a concealed weapon. Specifically, Leon testified that he repeatedly observed an angular bulge in the "dip" of Defendant's right side. He further testified that he had seen Defendant walk "stiffly" and perform several "security checks" coinciding with Defendant's attempt to secure a possible weapon that he was carrying without a holster. During the motions hearing, the Court noted that many of the instances Leon referred to as security checks appeared to coincide with the Defendant

---

[2] Although the docket reflects Defendant Sharieef Dupree's Motion for Leave to Amend, Supplement, Withdraw or File Additional Motions (ECF No. 17) as still pending, the Court GRANTED this motion on the record during the first part of the motions hearing on Thursday, August 1, 2013.

[3] Leon testified that he had been a police officer in Puerto Rico for seven (7) years, then a Baltimore City Police Officer for five (5) years until his retirement from the force for medical reasons. His training also included training received as a City Watch Operator concerning the "characteristics of an armed person."

touching his stomach or his leg. Additionally, during the playing of the videotape and subsequent legal argument, the Court also indicated that while there was a bulge on Defendant's right side, there was never any specific indication that this bulge was caused by a firearm. Indeed, Leon acknowledged that the videotape does not contain any video of the firearm itself. However, Leon testified that based on his training and experience as well as his observations of the Defendant's activity from about 6:30 p.m. to 6:50 p.m. on June 5, 2012, he specifically notified police officers patrolling the area that a man wearing a yellow shirt was in fact armed and standing on the porch of 656 Cokesbury Avenue.

At or about 6:50 p.m. on June 5, 2012, Detective Romey ("Romey") testified that he, Sergeant Burns ("Burns") and Detective Hersl ("Hersl") were in a patrol car at the intersection of Hargest Lane and Aiken Street in Baltimore, Maryland. According to the testimony of both Romey and Hersl, at that time they received a report from Leon on the patrol car's department radio that an individual wearing a yellow shirt was armed and standing on the porch of 656 Cokesbury Avenue. The recording of this report indicates that Leon also mentioned that it looked like "there's gonna be a war or something."[4] C-Channel Recording, Gov't Ex. 3, Track 3. As a result of this report, Burns, Romey and Hersl went to 656 Cokesbury Avenue to investigate the situation. As they arrived at the location, Romey got out of the car and headed in the direction of the house, and Hersl ultimately walked to the back of the house. According to Romey and Hersl, they were both wearing vests identifying themselves as police officers. Romey initially testified that as he approached the residence Defendant Dupree fled into the house. However, the tape showed and Romey

---

[4] There was no evidence introduced by the Government indicating any gang activity or any confrontation among other individuals at this location on the evening in question.

3

acknowledged, following direct questioning by the Court, that Defendant Dupree did not in fact flee into the house. Instead, the video reflected that contemporaneous with Romey's arrival, Defendant was standing in the doorway of 656 Cokesbury Avenue and turned and went into the house in a normal, regular fashion and shut the door. The video then showed another individual with a white shirt and white cap going up the stairs more quickly and into the house. The video then reflected that Detective Romey ran up the stairs onto the porch and opened the closed door, entering the residence at 656 Cokesbury Avenue.

Once in the house, Romey testified that as Defendant Dupree noticed him, he immediately took a gun from under his shirt and threw it on a nearby couch. Romey testified that as Dupree began to run toward the back of the house, he attempted to follow him. However, Romey testified that he stopped his pursuit of the Defendant once Dupree exited the house from the back door. Romey then returned to the couch and secured the weapon which was later identified as a Glock 9mm caliber handgun, serial number NKL259 containing four (4) 9mmm caliber rounds of firearm ammunition.

In the meantime, Hersl had taken a position at the rear of the residence because in his experience, suspects are known to run out the back of houses. He testified that he saw Defendant Dupree run out the back of the house, jump a fence and then run northbound. Hersl then testified that he began pursuing Defendant Dupree. While he lost track of Dupree for a couple of seconds, he caught a glimpse of Dupree as he attempted to hide by laying down on the porch of a house a couple of blocks away. Hersl testified that he then proceeded to a location where he could have a tactical advantage over the Defendant and then drew his weapon as he approached the Defendant's location. He testified that when he

4

came upon the Defendant, he began shouting commands. In response, Hersl testified that Defendant Dupree raised his hands, called him by name and said "Hersl, I don't have a gun. I just got some cokes and dopes."[5] Aug. 1, 2013, Mots. Hrg., ECF No. 33. Hersl testified that he understood "cokes" to mean cocaine and "dopes" to mean heroin. As a result, Hersl placed Defendant Dupree under arrest and testified to recovering seven (7) baggies containing suspected cocaine and heroin from the Defendant. The substance was later identified as heroin, hence the dismissal of the cocaine possession charge contained in Defendant's original Indictment.

As of July 18, 2013, Defendant Dupree is charged in a three-count Superseding Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count One), possessing heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count Two), and possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count Three). Pending before this Court are Defendant's motions to suppress the gun (ECF No. 18), the statements made to Hersl (ECF No. 19) and the drug evidence recovered from his person (ECF No. 20).

ANALYSIS

I. **MOTION TO SUPPRESS THE GUN**

Defendant Sharieef Dupree ("Defendant" or "Dupree") has moved to suppress the gun recovered from 656 Cokesbury Avenue. The government contends that the police had reasonable, articulable suspicion to believe that the Defendant was armed under the "collective knowledge" doctrine and that the subsequent "flight" of the Defendant into the

---

[5] No evidence was introduced indicating why the Defendant knew Detective Hersl's name.

house validated and heightened this suspicion. In response, Defendant argues that the police did not have reasonable, articulable suspicion to believe that he was armed and that even if there was reasonable, articulable suspicion, it did not rise to a level justifying an intrusion, absent probable cause and/or exigent circumstances, into 656 Cokesbury Avenue.

### A. <u>Reasonable, Articulable Suspicion</u>

The first issue with respect to the search and seizure of the gun is whether Detective Romey ("Romey") had the requisite reasonable, articulable suspicion to chase Defendant Dupree into 656 Cokesbury Avenue ("the house"). In the context of a motion to suppress evidence seized during a warrantless search, the government bears the burden to prove by a preponderance of the evidence that the search and seizure did not violate the Fourth Amendment. *See United States v. Matlock*, 415 U.S. 164, 177-178 n.14 (1974) (noting that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"). As the United States Court of Appeals for the Fourth Circuit has recently noted:

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed to prevent *arbitrary and oppressive* interference by law enforcement officials with the privacy and personal security of individuals.

*United States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013) (citations and internal quotation marks omitted) (emphasis added). "An officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 30 (1968). While the "reasonable

6

suspicion" standard is not an onerous one, there must be "at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123; s*ee also, e.g.*, *United States v. Harris*, 39 F.3d 1262, 1268-69 (4th Cir. 1994). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27). "[T]he Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." *United States v. Foster*, 634 F.3d 243, 248-49 (4th Cir. 2011). Accordingly, whether there is reasonable, articulable suspicion turns on "the totality of the circumstances . . . including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect." *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989); s*ee also United States v. Arvizu*, 534 U.S. 266, 751 (2002).

The Fourth Circuit has stated that "under the collective knowledge doctrine (also known as the fellow officer rule), reasonable suspicion may be based on the collective knowledge of the officers involved in an investigation." *United States v. McRae*, 336 Fed. App'x 301, 305 (4th Cir. 2009) (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)). As such, the Fourth Circuit concluded that "law enforcement officers cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." *McRae*, 336 Fed. App'x at 205 (citing *United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996)). The Fourth Circuit, however, has warned that while "the collective-knowledge doctrine simply directs us to substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer;* it does not permit us to aggregate bits and pieces of information from among myriad

7

officers, nor does it apply outside the context of communicated alerts or instructions." *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) (emphasis in original).

Additionally, courts have accepted a number of factors as properly contributing to the creation of reasonable suspicion. The Fourth Circuit has held that reasonable suspicion calls for "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993); *see also Adams v. Williams*, 407 U.S. 143, 145 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow crime to occur or a criminal to escape."). Additionally, "[w]hile the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider." *Lender*, 985 F.2d at 154 (citations omitted). Moreover, "[t]he lateness of the hour is another fact that may raise the level of suspicion." *Id.* (citation omitted). Evasive conduct, furtive behavior and anonymous or informant tips have also been held to support findings that reasonable suspicion existed. *See, e.g.*, *United States v. Sims*, 296 F.3d 284, 285-87 (4th Cir. 2002) (anonymous tip and furtive behavior constituted reasonable suspicion); *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997) ("Evasive conduct can, of course, assist an officer in forming reasonable suspicion."); *Alabama v. White*, 496 U.S. 325, 328 (1990) ("[W]hile the unverified tip may have been insufficient to support an arrest or search warrant, the information carried sufficient 'indicia of reliability' to justify a forcible stop.").

Although Detective Romey initially testified at the hearing that Defendant Dupree "ran" into the house, he withdrew this description when questioned by the Court after the playing of the video recording. Specifically, the video reflected that at about 7:00:43 p.m., Defendant Dupree was standing in the doorway, and turned and walked into 656 Cokesbury Avenue, shutting the door. *See* Mots. Hrg., Gov't Ex. 1, ECF No. 33. Defendant Dupree was then followed by a man, wearing a white shirt and cap, who quickly went up the front stairs and entered the house and also shut the door. Thereafter, at about 7:00:50 p.m., Romey is seen pushing the door to 656 Cokesbury Avenue open and entering the premises at 7:00:52 p.m. *See* Mots. Hrg., Gov't Ex. 1. Accordingly, after a review of the videotape, the Court made a finding of fact on the record that there was no flight into the house on the part of Defendant Dupree.

As Defendant Dupree did not flee into the house, the only bases for reasonable, articulable suspicion to stop him at that point were the fact that a shooting had occurred on that same block the day before and the report of City Watch Camera Operator Leon specifically stated that a man in a yellow shirt was armed. With respect to Leon's observations, the Court determined that while there was a bulge under Defendant Dupree's shirt, nothing more indicated that it was necessarily a concealed firearm. Moreover, the Court noted that in some instances, the activity that Leon characterized as security checks could as easily be seen as Defendant simply touching his stomach or his leg. Although the collective knowledge doctrine allows the substitution of Leon's knowledge for that of Romey, *see Massenburg*, 654 F.3d at 493, based on the totality of the circumstances, there may have been reasonable, articulable suspicion to justify the questioning of Dupree if he had

9

remained outside of the residence. However, there was simply not reasonable, articulable suspicion to justify a warrantless entry into 656 Cokesbury Avenue. In fact, the Supreme Court of the United States has previously stated that "[i]t is a basic 'principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 477-78 (1971)). The Supreme Court further indicated that "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590.

The government contends that "a police officer may pursue a defendant to effect a *Terry* stop if exigent circumstances demand, and that a person may not avoid a lawful *Terry* stop simply by retreating into his own home." Aug. 13, 2013 Letter, ECF No. 48. Specifically, the government cites to an unpublished Fourth Circuit opinion, and the related authority, for the proposition that "courts have recognized that a person cannot avoid a *Terry* stop simply by retreating into a home." *Rivera v. Washington*, 57 Fed. App'x 558, 562 (4th Cir. 2003) (unpublished) (citations omitted). However, as stated on the record and reiterated here, these cases are distinguishable. The majority of the cases cited by the government involved situations where the defendant fled and the police had reasonable suspicion to stop the defendant before the defendant "retreated" into the house. *See, e.g.*, *United States v. Lenoir*, 318 F.3d 725, 730-31 (7th Cir. 2003) (holding that the police had reasonable suspicion to justify a *Terry* stop and that exigent circumstances existed to justify a warrantless entry where

10

the defendant fled from police and exhibited difficulties entering a home, which the police did not know to be his, while being intoxicated and holding a shotgun); *United States v. Pace*, 898 F.2d 1218, 1228 (7th Cir. 1990) (holding that the defendant's activities and elusive conduct gave the officer the requisite reasonable suspicion that the defendant was an assassin prior to the officer's entry into a residence's garage to detain the defendant); *Alto v. City of Chicago*, 863 F. Supp. 658, 662 (N.D. Ill. 1994) (holding that the officers had probable cause to arrest the defendant after he "broke free" from a *Terry* stop, "fled to his home" and "defied [the police's] reasonable request to stop"); *United States v. Gomez*, 495 F. Supp. 992, 1001 (S.D.N.Y. 1979) (holding that the officers had reasonable suspicion to effect a *Terry* stop before the defendants retreated and slammed the apartment door), *aff'd*, 633 F.2d 999 (2d Cir. 1980). The government also cites *Harbin v. City of Alexandria*, 712 F. Supp. 67, 71 (E.D. Va. 1989), *aff'd* 908 F.2d 967 (4th Cir. 1990). However, in that case the officers never entered the individual's home. *Id.*

In this case, as previously stated, there was no flight on the part of the Defendant Dupree. Moreover, the observations of Leon as well as the occurrence of a shooting in the area the day before were not sufficient to give Romey the required reasonable suspicion to enter a residence to effect a *Terry* stop. The government did not submit adequate proof that there was "hot pursuit of a felon, . . . imminent destruction of evidence, . . . the need to prevent a suspect's escape, . . . the risk of danger to the police or to other persons inside or outside the dwelling." *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). As a result, there were no exigent circumstances justifying Romey's entry into the home. Accordingly, a Fourth Amendment violation occurred at the time of Romey's entry into 656 Cokesbury Avenue.

B. **Standing of the Defendant**

The government has argued that the Defendant Dupree was not a resident of 656 Cokesbury Avenue and lacks standing to challenge the entry into the home. The Supreme Court has held that "a Fourth Amendment search does not occur—even when the explicitly protected location of a *house* is concerned—unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (quoting *California v. Ciraolo,* 476 U.S. 207, 211 (1986)); *see also Rakas v. Illinois,* 439 U.S. 128, 143 (1978) ("[T]he capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."). To challenge a search successfully under the Fourth Amendment, a defendant must have "a reasonable expectation of privacy" in the place that was searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Specifically, the court must determine (1) whether the individual "exhibited an actual (subjective) expectation of privacy [and (2)] . . . whether [his] subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Smith v. Maryland*, 442 U.S. 735, 739-40 (1979) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)).

In *Minnesota v. Carter*, the Supreme Court held that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is *merely* present with the consent of the householder may not." 525 U.S. 83, 90 (1998). The case involved the arrest of defendants who were in another person's apartment for a short time solely for the

purpose of packaging cocaine. The Supreme Court reviewed its decision in *Minnesota v. Olson* and stated:

> If we read the overnight guest in *Minnesota v. Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondent's situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

*Carter,* 525 at 91. Essentially, the Supreme Court established the distinction between a social guest, who may claim Fourth Amendment protections, and a business guest, who is "simply permitted on the premises" and cannot claim Fourth Amendment protections. *Id.* Similarly, in *Jones v. United States*, the Supreme Court held that the defendant could challenge the search of an apartment that did not belong to him but of which he had the use and possessed the key. 362 U.S. 257, 267 (1960). Additionally, in that case, the defendant testified on cross-examination that he had clothing at the apartment, that his home was elsewhere and the he paid nothing for the use of the apartment but that his friend let him use it and that he had slept there maybe one night when his friend was out of town. *See id.*

In *United States v. Rhiger*, the United States Court of Appeals for the Tenth Circuit held that the defendant's "regular presence at the home, his overnight stays, the discovery of receipts in the house, and his comfort in entering the residence unannounced and taking a nap, all support[ed the court's] determination that [he] had an ongoing meaningful connection to [the] home as a social guest," thereby conferring on him the standing necessary to challenge the search and seizure of the evidence in that home. 315 F.3d 1283,

13

1287 (10th Cir. 2003).⁶ Finally, in a case similar to the case at hand, albeit not controlling, the Court of Appeals of Georgia held that the defendant was a social guest with a legitimate expectation of privacy in the premises where "[h]e was a frequent welcome social visitor, he left possessions there, and he had spent the night as a social guest." *State v. Brown*, 442 S.E.2d 818, 821 (Ga. Ct. App. 1994). The Court of Appeals of Georgia further stated: "[t]hat he may not have been spending the night on this occasion does not alter his status as [a] social guest [as] he had been allowed previously to 'seek shelter' by entering [the] house on a recurring basis." *Id.*

During the hearing, Nicole Green, the owner of 656 Cokesbury Avenue, testified that she and Defendant Dupree were longtime friends and that she considered him to be family. Additionally, she testified that he had stayed overnight in her home on several occasions and that he was welcome there anytime and could walk in with no explanation. Because Green testified that Defendant Dupree helped her with her music business and her wholesale business, the government has suggested that he was a business guest and not a social guest. The government further argues that Dupree was not a social guest at 656 Cokesbury Avenue because he had not stayed there overnight the night prior to his arrest. However, Green testified that Defendant Dupree was a longtime friend whom she considered to be family, who is welcome at her home anytime and who has spent several nights at her home. Moreover, she testified that Dupree is one of the friends she trusts and relies on to help with her business and around the house when her medical condition makes it difficult for her to

---

⁶ In that case, the defendant testified that he had only known the resident of the apartment for two weeks and that he had only stayed there overnight three to four times "when he was too intoxicated to drive home." *Righer*, 315 F.3d at 1286.

14

care for herself and her affairs. Accordingly, the Court is satisfied that Defendant Dupree was a frequent social guest at 656 Cokesbury Avenue on June 5, 2012. Therefore, he had a legitimate expectation of privacy in those premises and can claim the protections of the Fourth Amendment.

As a result, Defendant Dupree has standing to challenge the search and seizure of the gun at 656 Cokesbury Avenue. As a result of the Fourth Amendment violation in entering the house, the seizure of the gun was unconstitutional. Thus, Defendant Dupree's Motion to Suppress Evidence (ECF No. 18) seized from the residence is GRANTED.

II.     **MOTIONS TO SUPPRESS DEFENDANT'S STATEMENTS AND THE DRUGS**

Defendant Dupree also seeks to suppress the statements, "Hersl, I don't have a gun. I just got some cokes and dopes," and the drugs that were recovered from his person incident to his arrest. First, the Defendant argues that this evidence constitutes the fruit of the poisonous tree of the illegal entry into the house and must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The admissibility of this evidence, which was obtained after an illegal entry, depends on whether, "granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (citation and quotation marks omitted). The "presence of intervening circumstances" is one relevant factor in determining whether the evidence was secured by exploitation of the illegality. *Brown v. Illinois*, 422 U.S. 590, 603 (1975).[7]

---

[7] The "temporal proximity" between the illegal police conduct and the subsequent seizure, as well as the "purpose and flagrancy of the official misconduct," are also relevant factors in determining whether the taint is purged. *Brown*, 422 U.S. at 603-04.

15

In this case, the flight of the Defendant Dupree despite the pursuit of a police officer known to him created an intervening circumstance independent of the original unlawful entry into the residence. Once Romey entered the house, Dupree ran out the back of the house, jumped a fence, and ran northbound. He fled at the sight of the police whom he appeared to recognize. The neighborhood was a known high crime area, and the police were aware of a shooting the day before. Moreover, Detective Hersl testified that in his experience, suspects are known to run out the back of houses. As in this case, an individual's presence in a high crime area combined with his flight at the sight of law enforcement constitutes reasonable suspicion to support a *Terry* stop. *See Illinois v. Wardlow*, 528 U.S. at 124; *Massenburg*, 654 F.3d at 486-88; *accord United States v. Black*, 525 F.3d 359, 365-66 (4th Cir. 2008). Although Dupree's conduct occurred within a minute of Romey's entry into the house, the temporal proximity of the police illegality and subsequent seizure of evidence is just one factor that a court must consider when analyzing a fruit of the poisonous tree argument. Considering the relevant factors recited in *Brown*, this Court finds that Dupree's conduct qualifies as an intervening circumstance. As such, it purges the taint of the unlawful entry, and the evidence subsequently seized cannot be considered fruits of the poisonous tree. *See Brown*, 422 U.S. at 603-04.

As for Defendant Dupree's statements to Detective Hersl, it is well established that spontaneous comments by a defendant are admissible. *See, e.g., United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985); *United States v. Grant*, 549 F.2d 942, 946 (4th Cir. 1977). The Fourth Circuit reasoned in *Grant* that *Miranda v. Arizona*, 384 U.S. 436 (1966), does not protect "an accused . . . from a spontaneous admission made under circumstances not

induced by the investigating officers or during a conversation not initiated by the officers." 549 F.2d at 946. As in *Grant*, Dupree's statements were not solicited or induced by Hersl's initiation of a conversation or questioning. Rather, they were voluntary and spontaneous, and therefore "not the product of interrogation." *Rhodes*, 779 F.2d at 1032. Accordingly, Dupree's statements are admissible.

Finally, the drugs which the Defendant moves to suppress were seized by a reasonable search incident to lawful arrest. Based on the Defendant's statement that he had "cokes and dopes," as well as his flight at the sight of the police with whom he was familiar, Hersl placed the Defendant under arrest. The Supreme Court has held that warrantless arrests and searches incident thereto are permitted where there is probable cause to believe a felony is being or has been committed based on the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *see also United States v. Johnson*, 599 F.3d 339 (4th Cir. 2010) ("Under the Fourth Amendment, a warrantless arrest is an unreasonable seizure unless there is probable cause to believe that a criminal offense has been or is being committed."). In this case, Defendant's statements raised Hersl's reasonable suspicion of criminal activity to the level of probable cause required for an arrest. Moreover, the search incident to arrest was reasonable. As a result, the drugs were lawfully obtained after a legal search incident to arrest.

Accordingly, Defendant's Motions to Suppress Statements and Tangible Derivative Evidence (ECF Nos. 19 & 20) are DENIED.

## CONCLUSION

For the reasons stated above, Defendant Sharieef Dupree's Motion to Suppress Evidence (ECF No. 18) is GRANTED.  However, Defendant Sharieef Dupree's Motion to Suppress Statements (ECF No. 19) and Motion to Suppress Tangible and Derivative Evidence (ECF No. 20) are DENIED.

A separate Order follows.

Dated:	August 20, 2013	/s/_____
	Richard D. Bennett
	United States District Judge